[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Before the Court is the defendant's motion for a new trial or, in the alternative, a remittitur. The jury in this civil action returned a verdict for plaintiff, Kathleen Rozpad, in the amount of $2,000,000. and for plaintiff, Joseph Rozpad, in the amount of $65,000.
In his motion, defendant contends that plaintiff had no lost earnings, only $19,000. in specials and the slimmest possibility of future surgery. Defendant further contends that plaintiff's ability to perform her normal, daily functions belies her claim of permanent disability. For these aforementioned reasons, defendant contends that the verdict cannot stand.
The duty of a trial justice in ruling on such a motion is to consider in the exercise of her independent judgment all of the material evidence in the case in light of her charge to the jury and to pass on its weight and the credibility of the witnesses.Barbato v. Epstein, 97 R.I. 191, 196 A.2d 836 (1964). In discharging that duty she can accept some or all of the evidence as having probative force; or she can reject some of the testimony because it is impeached or contradicted by other positive testimony or by circumstantial evidence, or because of inherent improbabilities or contradictions which alone or in connection with other circumstances satisfies her of its falsity, or because it is totally at variance with undisputed physical facts or laws; or she can add to the evidence by drawing proper inference therefrom and giving weight thereto. If the evidence is evenly balanced or is such that reasonable minds could arrive at different conclusions, the motion should be denied. Only if the trial justice determines that the jury's verdict is clearly wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice or if it is against the weight of the evidence should the motion be granted.
There was never a question relative to liability. Defendant operated on the wrong body part and allegedly did so negligently. While defendant did concede liability, it was made clear at the outset that he intended to rely on some of his medical records to refute plaintiff's claims of disability. Inasmuch as some records and medical information would be introduced into evidence, it was appropriate and necessary to have all the records and medical information available for the jury's consideration.
During her initial treatment with defendant, plaintiff had a good right foot and a bad left foot. As a result of the surgery in question, plaintiff now has a bad left foot and a worse right foot. Plaintiff has yet to undergo the surgery on her bad left foot. As a result of the now necessary delay in this procedure, the condition of the left foot has worsened.
Despite two surgical procedures on the hitherto good right foot, there is the need to surgically correct the hammertoe deformity resulting from the surgery.
Essentially, the medical testimony was clear that plaintiff needs the surgery on both feet but it was also clear that no physician can offer her much beyond the hope that her condition will stabilize. Her medical situation vis a vis surgery oneither foot is frought with risks. No physician is enthused at the prospect of subjecting plaintiff to any more pain. That she is doomed to a life in Reeboks is the very least of her problems. She has suffered considerable pain and suffering as a direct result of defendant's negligence. She will continue to suffer in the future as a result of that negligence.
Various medical personnel testified on plaintiff's behalf. Drs. Gang, Novicki and Snyder testified as to the extent of plaintiff's scarring. Drs. Novicki and Snyder testified as to the extent of deterioration in her left foot and nerve damage in her right foot. There was substantial medical testimony about plaintiff's two and one-half months on crutches, six and one-half months in casts; plaintiff's subsequent need for ankle braces, and the necessity for such devices again in the future.
Dr. Santopietro, although finding that plaintiff has improved, did testify to the original onslaught of difficulties brought about by defendant's negligence.
Plaintiff was, on a scale of 1 to 10, a ten. She was articulate and understated and all the more moving because of those qualities. She did weep occasionally but there were no "emotional outbursts" as stated by defendant. The Court found plaintiff reserved and controlled. Given her medical history at the hands of defendant, her composure was compelling.
Plaintiff Joseph Rozpad was even more understated than his wife. The Court found him articulate, candid and minimalistic in terms of what he and his wife have endured as a couple. His testimony was most effective.
Defendant was, on a scale of 1 to 10, a one. It would be virtually impossible to imagine anyone conveying a more negative impression. In response to a question from plaintiff's counsel in which reference was made to a statement made by defendant's counsel in his opening statement, defendant responded that he, defendant, had not been listening intently. At another point during trial, when defendant was referred to a statement made by one of plaintiff's medical experts, defendant replied that he was making notes on something else at that time.
On two occasions, as defendant was describing how the surgical procedure in question went awry, he got his left and right mixed up. Defendant's testimony regarding a conversation he had with plaintiff in the operating room area, after she had been medicated, at which time she allegedly assented to his treatment, is utterly incredible. If defendant's inattention and demeanor on the witness stand is reflective of the manner in which he practices podiatry, it is a wonder the verdict was not higher.
Defendant cites a number of cases in which incidents of allegedly similar injuries resulted in jury verdicts far below that awarded in this case. His argument is misplaced and inappropriate. There are no benchmarks by which juries must be guided. Each case is unique and each case has a personality of its own.
That a jury award fails to comport with what counsel perceives is a monetary pattern in similar cases is of no consequence. And it should be noted that plaintiff's counsel referenced cases in which jury verdicts were rendered in amounts considerably higher than those cited by defendant.
Defendant devotes a portion of his memorandum to the manner in which plaintiff's counsel cross-examined defendant and argued to the jury.
The plaintiff's case was presented as crisply, clearly, thoroughly and efficiently as a case could be presented. At no time did plaintiff's counsel conduct himself in anything but a professional manner.
There was nothing defendant could do to minimize the impact of plaintiff's case. The testimony of all plaintiff's experts, including Dr. Santopietro, was compelling and virtually unassailed. And defendant's expert, Dr. Bigelli, was not impressive. He was totally discredited under cross-examination and there were thus ample grounds upon which the jury could give his testimony no weight.
It is, and was, abundantly clear that plaintiff had proven that she was entitled to a substantial damage award. The issue is whether 2 million is punitive. It is. The jury apparently could not help but punish defendant for his negligence. His final, gratuitous statement that he would do nothing differently save for not getting his left and right mixed up was astounding.
After careful review of the evidence, the Court is satisfied that the jury was influenced by prejudice against defendant and that its verdict was so grossly excessive as to be punitive. The Court further finds that the sum of $650,000. would adequately compensate the plaintiff for damages sustained as a result of defendant's negligence. Accordingly, unless plaintiff remits all of the jury's verdict in excess of $650,000., the Court orders a new trial solely on the issue of damages.
Counsel shall prepare a judgment order consistent with this decision.